United States District Court
Southern District of Texas
**ENTERED**
September 13, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DWAYNE WALKER, | § | CIVIL ACTION NO. |
| Plaintiff, | § | 4:19-cv-04454 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| CITY OF HOUSTON, | § | |
| *et al*, | § | |
| Defendants. | § | |

## OPINION AND ORDER
## GRANTING SUMMARY JUDGMENT

The motions for summary judgment by Defendants are granted. Dkts 37 & 38.

1. Background

Plaintiff Dwayne Walker brought this action against officers of the Houston Police Department and the City of Houston pursuant to 28 USC § 1983, asserting claims for the violation of his rights under the Fourth and Fourteenth Amendments. He alleges excessive use of force against Officer Shane C. Privette, bystander liability against Officers Dalton T. Webb and Steven Kirkland Hein, and various theories of municipal liability against the City of Houston. Walker also brought a supervisor-liability claim against a putative John Doe, which was dismissed at hearing for failure to prosecute such action. Dkt 59.

Underlying this action are "buy/bust" operations conducted by HPD narcotics division officers in North Houston on the evening of November 14, 2017. As part of those operations, non-party undercover Officer M.B. Parker approached an individual later identified as

Walker. See Dkts 39-23 (Parker reports) & 39-40 (HPD investigation report).

Parker asked whether Walker could supply him with crack cocaine, to which Walker agreed. Walker entered Parker's vehicle, and the pair drove to an address known for drug activity. At Walker's request, they picked up a woman along the way later identified as Heather Asbury. Once they arrived at the address, Walker exited the vehicle and returned with what Parker believed to be crack cocaine. Parker then gave the arrest signal to surveillance officers, who instructed uniformed Officers Privette and Webb to arrest Walker for "delivery of a controlled substance." Dkts 39-23 (Parker reports) & 39-40 (HPD investigation). Parker then drove Walker and Asbury to a gas station and parked at a gas pump. Dkt 39-23.

The events that followed were captured on the body-cameras of Privette and Webb, as well as on that of non-party Officer J.D. Pavlika. Dkts 39-2 & 50-1 at 2 (Privette video); 39-16 & 50-1 at 1 (Webb video); 39-8 & 50-1 at 12 (Pavlika video). Additional footage was captured by security cameras at the gas station. Dkts 39-18 (gas station video 1) & 39-19 (gas station video 2). Walker himself relies primarily upon this evidence, thus implicitly agreeing that the video footage is the best evidence in this case. See generally Dkt 49. And indeed, the Fifth Circuit instructs lower courts to view evidence proffered on summary judgment in light of this available video evidence. See *Betts v Brennan*, 22 F4th 577, 582 (5th Cir 2022), citing *Scott v Harris*, 550 US 372, 381 (2007); *Craig v Martin*, 26 F4th 699, 704 (5th Cir 2022).

The following narrative is thus summarized from the video evidence, predominantly relying on footage from the Privette and Webb body-cameras. See Dkts 39-2 (Privette video) & 39-16 (Webb video). Those videos are synced to the same relative time, but timestamp citations designate from which of the two videos the narrative is primarily drawn. The narrative is supplemented by additional summary judgment evidence where specified.

*2:00 to 2:30 (Webb video).* Privette arrived at the gas station in a marked unit with Webb moments after Parker's vehicle and parked behind it. Webb immediately proceeded to the rear passenger-side door. He told Walker, who was sitting in the front passenger seat, to put his hands on the dashboard. And he demanded Asbury exit the vehicle. Both complied. See also Dkts 39-18 at 1:30 to 1:50 (gas station video 1). The record establishes that Walker weighs approximately 200 pounds and stands 6 feet, 2 inches tall. See Dkts 39-11 at 2 (April 2018 medical record), 39-23 (Parker reports) & 39-40 (HPD investigation report).

*2:10 to 2:50 (Privette video).* Parker exited the vehicle and passed Privette, who proceeded to the rear driver-side door. Privette stated that he would "watch the male" (being Walker) and moved to the front driver-side door. He then walked around the front of the car and opened the front passenger door. Privette first asked Walker to "scoot up and face away" from him, but he subsequently told Walker to exit the vehicle. As Walker exited, Privette instructed Walker to put his hands behind his back. Rather than immediately comply, Walker instead closed the vehicle's door, rotating the right side of his body around the door as it closed. This action turned his left arm towards Privette.

*2:50 to 3:20 (Privette video).* Privette grabbed Walker's left forearm and bicep and again demanded that he put his hands behind his back. Walker instead turned the right side of his body away from Privette, out of Privette's reach. Walker twice stated that he had previously been shot in his right arm. Privette loudly commanded Walker to put his hands behind his back as he handcuffed Walker's left wrist. Walker braced his right arm against a gas station pillar. Privette seized Walker's right wrist and brought that arm towards him. Walker then pulled it out of Privette's grasp, again turning his right side away from Privette. Walker repeatedly made reference to "my shoulder." Privette issued another verbal command and seized Walker's right forearm, pulling it towards him. But Walker continued to resist Privette's attempts to put his right arm behind his back. Privette stated, "I'm going to put you on the ground,

3

dude." Walker responded that his shoulder "won't go back," and asked Privette to look at his shoulder.

*3:15 to 3:25 (Privette video).* Privette lifted Walker's sleeve and observed a large scar on his right shoulder. He stated, "Alright, I'm going to handcuff you in the front then, okay?" In the background, Webb can be heard saying, "Check him for weapons first." Privette released both of Walker's arms, quickly felt Walker's front waist for weapons, and rotated himself around Walker's right side. See also Dkt 39-20 (Privette reports).

*3:25 to 3:30 (Privette video).* Walker was now facing Parker's truck with his left arm out of Privette's immediate reach. Privette seized Walker's right forearm and twice demanded that Walker put his hands in front of him. Walker responded, "Hold up," as Privette reached for his left arm and the loose handcuff. Privette grabbed and pulled Walker's left forearm. Walker leaned towards Privette—who was attempting to gain control of the loose handcuff—then rotated his right side away from Privette. He jerked backwards, causing Privette to lose his grasp on Walker's left arm. See also Dkt 39-20 (Privette reports).

*3:30 to 3:40 (Privette video).* Privette then attempted to take Walker to the ground. At this point, Privette's body-camera was knocked off. But Privette in his report wrote, "I attempted to take him to the ground by forcing his left arm towards the ground by the attached handcuff and by placing my right hand on his left arm, using it as leverage." The video footage from the gas station security camera confirms this account. It also shows that Walker maintained his balance, ultimately breaking away from Privette, who held Walker's left wrist by the attached handcuff. Privette managed to swing Walker around, but Walker still didn't fall. Walker can also be heard repeatedly saying, "Let me go, man." See also Dkts 39-20 (Privette reports), 39-18 at 3:10 to 3:15 (gas station video 1), 39-23 (Parker reports), 39-15 at 20 (Walker deposition) & 39-40 (HPD investigation report).

*3:30 to 3:40 (Webb video).* By this time, Webb had seen the altercation and ran to assist Privette. Webb's body-

4

camera video affords the best view, given that available security-camera footage is distant and blurry and/or largely blocked by a parked car. In any event, Webb tackled Walker to the ground. An officer demands that Walker put his hands behind his back. But Walker rolled onto his right side and kept both hands close to his waistband, with his left hand under his body out of the officers' view. See also Dkts 39-18 at 3:10 to 3:20 (gas station video 1) & 39-19 at 3:15 to 4:15 (gas station video 2).

*3:40 to 3:45 (Webb video).* Officer Hein had recently arrived on the scene in another unit, and he rushed to assist when he saw the scuffle begin. He told Walker to "do what they say," referring to Privette and Webb. And he attempted to gain control over Walker's right arm. See also Dkts 39-22 (Hein reports) & 39-40 (HPD investigation report). Privette stood near Walker's legs. He then leaned over Walker and delivered three to four knee strikes to Walker's body. These strikes are difficult to see on film, and Walker doesn't react. See also Dkt 39-18 at 3:20 to 3:30 (gas station video 1). But all parties agree that the strikes were delivered. See Dkts 37 at 12 (officer motion), 38 at 10 (city motion) & 49 at 14 (Walker response); see also Dkts 39-20 (Privette reports), 39-21 (Webb reports) & 39-22 (Hein reports). Yet Walker continued to struggle against the officers' attempts to restrain his arms. All the while, the officers were issuing verbal commands to Walker to put his hands behind his back.

*3:45 to 4:25 (Webb video).* Privette moved around Walker so that his legs were adjacent to Walker's chest, with his right leg drawn back. He grabbed Walker's left bicep and shoulder with both hands, momentarily released, and then delivered a single knee strike to Walker's face with his right knee. Walker immediately reacted, saying, "He hit me in the eye. He hit me in the eye. He hit me. Record it. Record it." Only then did officers gain control over both of Walker's arms. But Walker still continued resisting, with Privette unable to secure the handcuffs for another thirty seconds. And another officer can be heard telling Walker, "Quit fighting it, dude. Dude, I'm going to

5

pound your ass." Privette secured the handcuffs without any other use of force.

*5:50 to 10:25 (Privette video).* A search revealed that Walker had a pair of scissors on his person. Officers at the scene quickly called the paramedics to attend Walker's injuries. But officers kept Walker on the ground until paramedics arrived, as he continued to struggle, yell, and direct statements to officers such as "kill me" and "get your f**king hand off me, b***h." See also Dkts 39-20 (Privette reports) & 39-21 (Webb reports).

*32:00 to 32:55 (Webb video).* Officers moved Walker to Pavlica's unit after paramedics assisted him. He gave officers his name and date of birth. Prompt research then revealed that Walker had an outstanding warrant for a parole violation, known as a *blue warrant*. Walker told Pavlica that he "already knew he had a blue warrant." Officer Pavlica asked, "Is that why you kind of fought a little bit?" And Walker replied, "Ya." Dkt 39-8 at 1:18:00 to 1:22:00, 1:30:40 to 1:31:50 (Pavlica video). Defendants elsewhere establish by undisputed evidence that Walker has a lengthy criminal record, and had been free on parole for only three months after serving a thirty-year prison sentence. See Dkt 37 at 13–14 (collecting evidence).

*10:30 to 10:55 (Webb video).* On later video, Privette and Webb discussed what occurred. Referencing the knee strike to Walker's face, Privette stated that he "did about four body shots before I did that." And he continued, stating, "I did exactly what Sarge requested."

Walker was ultimately diagnosed with closed fractures of the left orbital floor, nasal bone, and maxillary sinus. Dkt 50-1 at 105 (medical records). He was also later charged with felony delivery of a controlled substance. He pleaded guilty on March 8, 2018. Dkt 39-24 at 3.

Walker filed a complaint with the HPD against Privette in December 2017 alleging unlawful use of force. The HPD Internal Affairs Division investigated, taking statements from Lieutenant M.S. Chavez, Parker, Pavlica, Sergeant K.E. McDaniel, Hein, Webb, and Privette. It also

6

reviewed medical records; response to resistance forms created by Hein, Webb, and Privette the day of the incident; an after-action response-to-resistance report created by McDaniel; and Walker's criminal history. The IAD issued a report exonerating Privette in March 2018. Dkt 39-40.

Walker filed this action in November 2019. Dkt 1. The City and the Officer Defendants moved for summary judgment after the close of discovery. Dkts 37 & 38. Argument was heard in February 2022. Resolved there were certain evidentiary objections by Defendants to Walker's summary judgment evidence. The above narrative disregards such evidence in line with rulings made at hearing. See Dkt 59.

2. Legal standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics Inc v Oregon Cardio-Devices Inc*, 257 F3d 449, 456 (5th Cir 2001), quoting *Anderson v Liberty Lobby Inc*, 477 US 242, 248 (1986). And a dispute is *genuine* if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v CCC & R Tres Arboles LLC*, 736 F3d 396, 400 (5th Cir 2013), quoting *Anderson*, 477 US at 248.

The summary judgment stage doesn't involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v Harris County*, 956 F3d 311, 316 (5th Cir 2020). Disputed factual issues must be resolved in favor of the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008).

7

The moving party typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice Designs LLC v Haydel Enterprises Inc*, 783 F3d 527, 536 (5th Cir 2015); see also *Celotex Corp v Catrett*, 477 US 317, 322–23 (1986). But when a motion for summary judgment by a defendant presents a question on which the plaintiff bears the burden of proof at trial, the burden shifts to the plaintiff to proffer summary judgment proof establishing an issue of material fact warranting trial. *Nola Spice*, 783 F3d at 536. To meet this burden of proof, the evidence must be both "competent and admissible at trial." *Bellard v Gautreaux*, 675 F3d 454, 460 (5th Cir 2012).

    3.  Analysis

All Defendants argue that no constitutional violation occurred. See Dkts 37 at 15–17 (officer motion) & 38 at 13 (city motion). The Officer Defendants also contend that even if one did, the claims against them are barred by qualified immunity because "Walker had no clearly established right to be free from minimal and necessary force while resisting arrest and attempting to flee." Dkt 37 at 14, 17–19.

Based upon the undisputed evidence, the involved officers plainly didn't violate Walker's constitutional rights. Argument regarding whether the right was clearly established thus requires only the briefest of discussion.

    a.  Claims for use of excessive force

The Fourth Amendment of the United States Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." This guarantees protection of individuals against the use of unreasonable force during an arrest or investigatory stop. *Tucker v City of Shreveport*, 998 F3d 165, 171 (5th Cir 2021). Even so, jurisprudence in this area has long recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to

8

effect it." Ibid, citing *Graham v Connor*, 490 US 386, 396 (1989). Consequently, a plaintiff bringing a claim regarding excessive force must prove that (i) he suffered an injury, (ii) the injury resulted directly and only from a use of force that was clearly excessive, and (iii) the excessiveness of the force was clearly unreasonable. *Craig*, 26 F4th at 704–05. As to the latter two aspects, the Fifth Circuit recognizes that the inquiries into "whether a use of force was 'clearly excessive' or 'clearly unreasonable . . . are often intertwined'" and addressed together. *Darden v City of Fort Worth*, 880 F3d 722, 728 (5th Cir 2018) (citation omitted).

Walker alleges two distinct instances of excessive force—when Privette took him to the ground, and then when Privette landed the knee strike to his face. Dkt 49 at 13–15. Each will be assessed in turn. The parties agree as to both that Walker suffered an injury and that the injury resulted from the use of force. But they disagree about whether the use of force was clearly excessive and clearly unreasonable.

Determining whether the force used to effectuate a particular seizure is *reasonable* for purposes of the Fourth Amendment "requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake." *Tucker*, 998 F3d at 171. This is necessarily a fact-intensive inquiry. *Craig*, 26 F4th at 705. The Supreme Court thus instructs courts to consider the totality of the circumstances, including (i) the severity of the crime at issue, (ii) whether the suspect posed an immediate threat to officer or public safety, and (iii) whether he actively resisted arrest or attempted to evade arrest by flight. *Darden*, 880 F3d at 728–29, quoting *Graham*, 490 US at 396 (quotation marks omitted).

At a more general level, the Fifth Circuit has also recently cautioned:

> Importantly, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

> of hindsight. Thus, not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. Instead, the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. Although all disputed facts are construed in favor of the non-movant in the summary judgment context, *evaluating the reasonableness of an officer's use of force requires consideration of how a reasonable officer would have perceived those facts.*

*Tucker*, 998 F3d at 171–72 (cleaned up, emphasis added).

The Fifth Circuit also recognizes that officers "must assess not only the need for force, but also the relationship between the need and the amount of force used." *Craig*, 26 F4th at 705 (quotation marks and citations omitted). And so on the one hand, the Fifth Circuit holds, "A use of force is reasonable if an officer uses measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance." Ibid (quotation marks and citation omitted). But on the other hand, the "speed with which an officer resorts to force, and the failure of the officer to use physical skill, negotiation, or even commands before applying such force, weigh in favor of finding that the use of force was excessive to the need." *Pena v Rio Grande City*, 816 F Appx 966, 973 (5th Cir 2020, *per curiam*).

### i. The takedown

*As to the severity of the crime,* it's undisputed that the officers had probable cause to arrest Walker for delivery of a controlled substance. This without question is a serious offense. See *Darden*, 880 F3d at 729, citing *Orr v Copeland*, 844 F3d 484, 493 (5th Cir 2016).

10

*As to whether Walker posed an immediate threat to officer or public safety,* "inherent dangers" are presented to officers when making a narcotics arrest. *Darden*, 880 F3d at 729. Interdiction of drug trafficking of its nature very often comes with the potential of encountering the threat or actuality of violence, including the use of firearms or other weapons. Moreover, the Fifth Circuit holds that a suspect who refuses to turn around and be handcuffed poses an immediate threat to officers. See *Cadena v Ray*, 728 F Appx 293, 296 (5th Cir 2018); *Poole v City of Shreveport*, 691 F3d 624, 629 (5th Cir 2012).

The undisputed evidence assessed from a reasonable officer's perspective demonstrates that Walker posed a danger both to officers and to the public. With respect to the public, video footage shows that the gas station maintained a steady flow of customers at the time of the arrest. Traffic can also be seen on the road in front and to the side of the gas station. See generally Dkts 39-18 (gas station video 1) & 39-19 (gas station video 2). Civilians were thus in close proximity to the action. With respect to the officers, Walker refused to put his hands behind his back upon instruction immediately after exiting the vehicle. He also refused to provide Privette his hands when Privette offered to handcuff him in front. Contrary to assertions by Walker, Privette hadn't searched Walker—he had only *briefly* brushed his hand against Walker's front waistband. While this might alleviate some concern, most areas of Walker's body hadn't been searched. Walker also had a loose handcuff on his left wrist—itself potentially dangerous. And because he faced Privette with his hands in front, Walker had significantly more ability to maneuver than a suspect who is facing away from an officer with his hands behind his back.

*As to whether Walker actively resisted arrest or attempted to evade arrest by flight,* the undisputed evidence assessed from a reasonable officer's perspective demonstrates that Walker was actively resisting arrest at the time of the takedown, thus justifying a use of force. The video evidence quite plainly contradicts weak contention by

11

Walker that he was compliant at "all times during the arrest." Dkt 49 at 13. At best, Walker initially complied with requests to put his hands on the dashboard. But he began resisting arrest both verbally and physically almost immediately after that. First, upon exiting the vehicle, Walker closed the front passenger door instead of placing his hands behind his back immediately as instructed. This is significant because Walker essentially removed the only obstacle in his path to escape. He then refused to place his right hand behind his back despite repeated verbal commands from Privette, at one point pulling his right arm away from Privette's grasp and turning towards him. Notwithstanding this resistance, Privette heeded Walker's entreaties regarding his alleged disability. Walker then rebuffed two additional requests by Privette to offer his hands in front of him. The video likewise contradicts assertion by Walker that he then simply "tensed up." Dkt 49 at 13. Instead, it clearly shows that Walker rotated the right side of his body away from Privette, looked over his right shoulder, and suddenly jerked backwards.

In sum, the totality of the circumstances establishes that the takedown wasn't objectively excessive or clearly unreasonable.

      ii.   The knee strike to Walker's face

*As to the severity of the crime,* the above analysis pertains.

*As to whether Walker posed an immediate threat to officer or public safety,* nothing that occurred after the takedown alleviated the threat Walker posed to the officers and the public. In fact, actions taken by Walker heightened concerns. He refused to go to the ground, requiring the intervention of Webb. And once on the ground, Walker kept his hands towards his waistband with his left hand out of sight. Recall that Privette had conducted only the briefest of searches. And so, a reasonable officer could certainly suspect that Walker might be reaching for a concealed weapon such as a knife—with a pair of scissors in fact found upon him later. See Dkt 39-2 at 6:10 to 6:14 (Privette video).

12

*As to whether Walker actively resisted arrest,* he quite clearly did. Walker first resisted going to the ground. And he nearly broke completely free from Privette, who only held Walker by the loose handcuff. Dkts 39-16 at 3:30 to 3:34 (Webb video) & 39-18 at 3:10 to 3:20 (gas station video 1). Walker also verbally resisted, repeatedly stating, "Let me go, man," and "I didn't do nothing." Once on the ground, Walker fought against attempts by officers to secure his arms. Earlier knee strikes to the body were to no avail. Indeed, even after Privette delivered the knee strike to Walker's face, Walker still struggled against verbal and physical efforts by officers to bring his hands behind his back. It took Privette almost another thirty seconds to secure the handcuffs. Dkt 39-16 at 3:47 to 4:25 (Webb video).

In sum, the totality of the circumstances again establishes that the knee strike to Walker's face wasn't objectively excessive or clearly unreasonable.

### iii. Conclusion as to excessive force

As neither the takedown nor the knee strike to Walker's face were objectively excessive or clearly unreasonable, Privette didn't violate Walker's Fourth Amendment right against unreasonable seizure. In each instance, Privette instead took "measured and ascending actions that corresponded to" Walker's "escalating verbal and physical resistance." *Poole*, 691 F3d at 629 (quotation marks and citation omitted).

A number of cases from the Fifth Circuit on analogous facts fully accord with this holding. See *Cloud v Stone*, 993 F3d 379, 385–86 (5th Cir 2021) (finding no excessive force where officer tased suspect who partially turned toward officer, refused to turn back around, and then fully turned toward officer with loose handcuff dangling from wrist); *Carroll v Ellington*, 800 F3d 154, 176 (5th Cir 2015) (finding force "was not unreasonable" where officers struck with hickory stick, kicked, and took down resisting suspect, then struck with fists and tased suspect several times as he continued to resist); *Poole*, 691 F3d at 625–26, 629 (finding no excessive force where officers pinned suspect to

vehicle and tased him after he backed away and repeatedly refused to surrender his arms, and then took suspect to ground after he kicked and screamed at officers); *Cadena*, 728 F Appx at 296–97 (finding no excessive force where four officers took down suspect after suspect backed away from officer instead of placing hands behind his back, and then twice tased suspect after he continued to resist).

Were there any doubt about whether a violation of constitutional right occurred, the above list of cases certainly makes clear that no official conduct violated clearly established law. Indeed, the Fifth Circuit in *Tucker v City of Shreveport* recently granted qualified immunity to officers who took down a suspect after he failed to promptly pull over once officers initiated the stop, grew increasingly physically and verbally agitated once he exited his vehicle, and tensed up when officers attempted to place him in handcuffs. 998 F3d at 178–180. It also found those same officers were "at a minimum" entitled to qualified immunity regarding their use of force after the takedown, where they punched and kicked suspect after he "freed his arms from the officers' grasps," placed "them underneath his body," and kicked indiscriminately. Id at 184. And the Fifth Circuit there suggested that distraction strikes "and even kicks designed to gain compliance to being handcuffed are 'measured or ascending' responses to an actively resisting suspect." Id at 181.

Summary judgment will be granted as to the Section 1983 claims against Privette for excessive force in violation of the Fourth Amendment. To the extent that Walker also brings this claim under the Fourteenth Amendment, it likewise fails. See Dkt 25 at ¶¶ 2, 58. The Supreme Court requires that claims for excessive force in the course of arrest must be analyzed under Fourth Amendment "reasonableness" standards rather than for substantive due process. See *Graham*, 490 US at 395.

### b. Claims for bystander liability

The Fifth Circuit holds that an officer who didn't personally act against the plaintiff may yet be liable under a bystander-liability theory where the officer knows that a

14

fellow officer is violating an individual's constitutional rights, has a reasonable opportunity to prevent the harm, and chooses not to act. *Whitley v Hanna*, 726 F3d 631, 646 (5th Cir 2013). Such standard plainly requires that a fellow officer commit a constitutional violation before another officer may be liable for failure to intervene.

With the claim for excessive force determined to be without merit, the bystander-liability claims against Hein and Webb necessarily fail. Summary judgment will be granted in their favor.

### c. Claims against the City of Houston

The claims against the City likewise fail. Quite simply, the City can't be held liable where neither Privette nor any of the other Officer Defendants violated Walker's constitutional rights. *Loftin v City of Prentiss*, 33 F4th 774, 783 (5th Cir 2022).

The claims also fail for the independent reason that Walker failed to respond to the City's motion for summary judgment. "It is well established in the Fifth Circuit that a federal court may not grant a 'default' summary judgment when no response has been filed." *Morgan v Federal Express Corp*, 114 F Supp 3d 434, 437 (SD Tex 2015) (quotation marks and alteration omitted), citing *Eversley v MBank of Dallas*, 843 F2d 172, 174 (5th Cir 1988). But if no response to the motion for summary judgment has been filed, the court may find as undisputed the statement of facts in the motion for summary judgment. Ibid. The Fifth Circuit likewise holds that when a nonmovant bears the burden of proof at trial, a movant may make a proper summary judgment motion under Rule 56 by alleging that the nonmovant has "no evidence" of its claims. *Austin v Kroger Texas LP*, 864 F3d 326, 335 (5th Cir 2017, *per curiam*).

Walker alleged that the City failed to have a written policy on the use of force and/or de-escalation tactics; has a history of incidents of excessive force; has taken "formal and informal actions in overlooking, hiding, and/or tacitly encouraging police misconduct of other officers"; and failed

to train its officers. Dkt 25 at ¶¶ 69–71. He bears the burden of proof on each of these claims.

The City contends that Walker has no evidence to support these claims. It further submits and fully establishes that it has specific policies governing police officers which disprove Walker's allegations; the evidence refutes the alleged complaint history of Privette; the complaints proffered by Walker to establish a pattern of officer misconduct were either unfounded or isolated unconstitutional actions by a single officer that can't support a claim against the City; and the defendant officers all met minimum training requirements under Texas law. See Dkt 38.

The motion for summary judgment by Defendant City of Houston will be granted.

### 4. Conclusion

The motion by Defendants Shane C. Privette, Dalton T. Webb, and Steven Kirkland Hein for summary judgment is GRANTED. Dkt 37.

The motion by Defendant City of Houston is GRANTED. Dkt 38.

The claims asserted by Plaintiff Dwayne Walker are DISMISSED WITH PREJUDICE.

A final judgment will issue separately.

SO ORDERED.

Signed on September 13, 2022, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge